

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | **FILED** |
| (2) NATIONAL FEDERATION OF INDEPENDENT BUSINESS, | JUL 1 0 2015 |
| (3) STATE CHAMBER OF OKLAHOMA, | Phil Lombardi, Clerk<br>U.S. DISTRICT COURT |
| (4) TULSA REGIONAL CHAMBER, and | |
| (5) PORTLAND CEMENT ASSOCIATION, | **1 5 CV - 3 8 6 JED   PJC** |

Plaintiffs,

Civil Action No. _____

v.

**LCvR3.1 Statement:**
**This action is related to *State of Oklahoma, et al. v. Environmental Protection Agency, et al.*, No. 4:15-cv-00381-CVE-FHM**

(1) UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

(2) GINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency,

(3) UNITED STATES ARMY CORPS OF ENGINEERS, and

(4) JO-ELLEN DARCY, in her official capacity as Assistant Secretary of the Army (Civil Works),

Defendants.

## COMPLAINT

The Chamber of Commerce of the United States of America, National Federation of Independent Business, State Chamber of Oklahoma, Tulsa Regional Chamber, and Portland Cement Association (collectively, "Plaintiffs") bring this civil action against the United States Environmental Protection Agency, Gina McCarthy, in her official capacity as Administrator of

the United States Environmental Protection Agency, the United States Army Corps of Engineers, and Jo-Ellen Darcy, in her official capacity as Assistant Secretary of the Army (Civil Works) (collectively, "Defendants"), and for their claims against them state and allege as follows:

## INTRODUCTION

1.    This country contains millions of miles of waters of all shapes and sizes.  These waters include rivers, streams, creeks, lakes, ponds, canals, salt marshes, springs, wetlands, lagoons, becks, ditches, arroyos, and even puddles, among others.  They run through backyards, farms, state lands, and parks.  Some cross state lines, but most do not.

2.    The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387 ("Clean Water Act" or "CWA"), grants federal agencies regulatory authority over a particular, limited subset of these waters.

3.    Specifically, the CWA gives the Environmental Protection Agency ("EPA") and the Army Corps of Engineers ("Corps") (collectively, the "Agencies") the authority to regulate "navigable waters," which are defined as "waters of the United States." *Id.* §§ 1344, 1362(7).

4.    Congress limited the scope of this regulatory authority by instructing the Agencies to "recognize, preserve, and protect the primary responsibilities and rights of States … to plan the development and use … of land and water resources." *Id.* § 1251(b).

5.    Nevertheless, on June 29, 2015, the Agencies adopted a rule that disrupts this careful balance.  *See* Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,053-37,127 (June 29, 2015) ("Final Rule").

6.    By broadly redefining "waters of the United States," the Agencies have asserted unprecedented authority to regulate the nation's waters.  In doing so, the Agencies have exceeded their power under the Clean Water Act, the Administrative Procedure Act ("APA"),

and the U.S. Constitution. Plaintiffs bring this action to stop this extraordinary expansion of federal authority.

7. If the Final Rule takes effect, Plaintiffs' members will suffer real economic harm to their businesses and property values because they will be forced to submit to expensive, vague, burdensome, and time-consuming federal regulations before they can perform the most mundane of activities on their property. Numerous industries representing a broad swath of the U.S. economy will feel the brunt of this rule. Even worse, the Final Rule will impose these burdens without achieving any measurable improvement to the environment.

8. Because the Final Rule exceeds the Agencies' statutory authority and violates the U.S. Constitution and because the Agencies failed to comply with the Regulatory Flexibility Act ("RFA") during the rulemaking process, Plaintiffs respectfully ask this Court for a declaratory judgment pronouncing the Final Rule invalid and an order vacating and setting aside the Rule in its entirety, pursuant to 5 U.S.C. § 706, as well as an injunction prohibiting the Agencies from enforcing the Rule, pursuant to 28 U.S.C. § 2202. The RFA also authorizes deferring enforcement of the rule because its enforcement would not be in the public interest. *See* 5 U.S.C. § 611(a)(4)(b); *see also AFL v. Chertoff*, 552 F. Supp. 2d 999, 1013 (N.D. Cal. 2007) (granting injunction where DHS failed to comply with the RFA and plaintiffs established significant costs in complying with rule).

**THE PARTIES**

**A.    Plaintiffs**

9. Plaintiff Chamber of Commerce of the United States of America ("Chamber") is a non-profit organization created and existing under the laws of the District of Columbia. The Chamber is the world's largest federation of businesses and associations, directly representing 300,000 members and indirectly representing the interests of more than three million U.S.

businesses and professional organizations of every size and in every industry sector and geographic region of the country. The Chamber brings this action on behalf of its members.

10. Plaintiff National Federation of Independent Business ("NFIB"), a California nonprofit mutual benefit corporation, is the nation's leading small business advocacy association, representing members in Washington, DC, and all 50 States (including nearly 4,000 members in Oklahoma). Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the rights of its members to own, operate, and grow their businesses, in accordance with lawfully imposed governmental requirements. NFIB represents about 350,000 independent business owners who are located throughout the United States, in varying industries that cover virtually all of the small businesses potentially affected by the Final Rule. NFIB brings this action on behalf of its members.

11. Plaintiff State Chamber of Oklahoma ("State Chamber") is a non-profit organization created and existing under the laws of Oklahoma. The State Chamber represents more than 1,000 Oklahoma businesses and 350,000 employees. It has been the State's leading advocate for business since 1926. The State Chamber provides a voice for Oklahoma employers and employees in the executive, legislative, and judicial branches of government in Oklahoma. The State Chamber brings this action on behalf of its members.

12. Plaintiff Tulsa Regional Chamber ("Tulsa Chamber") is a non-profit organization created and existing under the laws of Oklahoma. The Tulsa Chamber serves as the primary advocate for Tulsa's business community, representing more than 3,000 employers and employees across the Tulsa region. The Tulsa Chamber promotes the interests of its members in the executive, legislative, and judicial branches of government in Oklahoma. The Tulsa Chamber brings this action on behalf of its members.

13.     Plaintiff Portland Cement Association ("PCA") is a non-profit organization created and existing under the laws of Illinois.  PCA represents 26 U.S. cement companies operating 82 manufacturing plants in 35 States, with distribution centers in all 50 States, servicing nearly every congressional district.  PCA members account for approximately 80 percent of domestic cement-making capacity.  PCA takes an active role in industry advocacy for sustainability, job creation, economic growth, infrastructure investment, and overall innovation and excellence in construction throughout the United States.  PCA brings this action on behalf of its members.

14.     Collectively, Plaintiffs represent individuals, non-profit organizations, small businesses, associations, and corporations in Oklahoma and across the country that will suffer substantial harm if the Final Rule takes effect.

15.     Dozens of industries in which Plaintiffs' members operate will be adversely affected by the Final Rule, including manufacturing, mining, asphalt production, food production, pulp and paper production, paint manufacturing, electricity production, energy development, water utilities, sand, stone, and gravel operations, road construction and maintenance, landfills, real estate development, railroads, industrial development, and agriculture.

16.     If the Final Rule takes effect, Plaintiffs' members will immediately be barred by law from conducting routine activities on their property until they go through an expensive, vague, and time-consuming regulatory process.  These burdens will cause substantial harm to Plaintiffs' members.  In many instances, the cost of these regulations will be prohibitive, forcing Plaintiffs' members to abandon valuable projects and activities entirely.

17.     For example, one of these members owns an undeveloped parcel of land in Delaware County, Oklahoma, on which he intends to harvest timber and raise livestock in the future.  Although a creek runs across his property, it has only an intermittent flow and for most of the year has very little water running through it.  Nevertheless, because the creek will be classified as a "water of the United States" under the Final Rule, the member's property will become subject to federal authority, including costly permitting requirements.  Thus, while this member wishes to impound water from a spring on his property, his plans will be frustrated by the Final Rule's requirement that he obtain a federal permit in order to construct a berm to impound the water.  Without such an impoundment, this member will be unable to use his land to raise livestock or market the property to others who wish to use it for similar purposes.

18.     Another member operates an oil company in Creek County, Oklahoma.  Portions of the property will soon become subject to federal authority as "tributaries" under the Final Rule.  The member will thus be barred from drilling oil wells on certain portions of his property or carrying out associated projects in the ordinary course of business until he obtains a costly federal permit.  The Final Rule has caused an immediate devaluation of the property, as prospective buyers are now on notice that a federal permit will be required for any development or other non-exempt use.

19.     Numerous other members will suffer similar hardships under the Final Rule because portions of their land will become subject to federal authority causing devaluation of their properties and preventing maintenance and growth of their businesses.

**B.     Defendants**

20.     Defendant EPA is a federal agency within the meaning of the APA.  *See* 5 U.S.C. § 551(1).  EPA is charged with administering certain provisions of the Clean Water Act,

including, *inter alia*, the administration of pollution control programs over navigable waters. *See* 33 U.S.C. §§ 1251 *et seq.*

21.     Defendant Gina McCarthy is the EPA Administrator and is sued in her official capacity. Administrator McCarthy signed the Final Rule on May 27, 2015.

22.     Defendant Corps is a federal agency within the meaning of the APA. *See* 5 U.S.C. § 551(1). The Corps is charged with administering certain provisions of the CWA, including, *inter alia*, the regulation of discharge of dredged or fill material in navigable waters.

23.     Defendant Jo-Ellen Darcy is the Assistant Secretary of the Army (Civil Works) and is sued in her official capacity. Assistant Secretary Darcy signed the Final Rule on May 27, 2015.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201-2202 (further necessary relief), 5 U.S.C. §§ 701-706 (judicial review of final agency action), and 5 U.S.C. § 611 (judicial review of violations of the Regulatory Flexibility Act).

25.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the Tulsa Chamber resides in the district and because property that is the subject of this action is located in the district.

26.     Because Defendants may argue that there is a question as to whether jurisdiction lies with this Court pursuant to 28 U.S.C. § 1331 or in the U.S. Court of Appeals pursuant to 33 U.S.C. § 1369(b)(1), and because the deadline for a petition for review in the Court of Appeals is 120 days, Plaintiffs will—in an abundance of caution—file a protective petition for review in the U.S. Court of Appeals for the Tenth Circuit to challenge the Final Rule on similar grounds. This type of "dual filing" is common and prudent when jurisdiction may be disputed. *See, e.g., Am. Paper Inst. v. EPA*, 882 F.2d 287, 288 (7th Cir. 1989) (noting that "careful lawyers

must apply for judicial review [in the court of appeals] of anything even remotely resembling a reviewable order" under 33 U.S.C. § 1369(b)(1)).

## BACKGROUND

**A.     The Clean Water Act**

27.     Congress passed the Clean Water Act in 1972.  The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

28.     One of the statute's principal provisions is 33 U.S.C. § 1311(a), which provides that "the discharge of any pollutant by any person shall be unlawful."  "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," *id.* § 1362(12), and "pollutant" is defined broadly to include not only traditional contaminants but also solids such as "dredged soil, ... rock, sand, [and] cellar dirt," *id.* § 1362(6).

29.     Importantly, the CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." *Id.* § 1362(7).

30.     Relatedly, the Act also states that "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator [of the EPA] in the exercise of his authority under this chapter." *Id.* § 1251(b).

31.     The Act provides certain exceptions to its prohibition of "the discharge of any pollutant by any person." *Id.* § 1311(a).  Section 1342(a) authorizes the EPA to "issue a permit for the discharge of any pollutant, ... notwithstanding section 1311(a) of this title."  And Section

1344 authorizes the Corps, to "issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a), (d).

32.     The CWA imposes severe criminal and civil liability for those who discharge materials without obtaining the required permits. *See, e.g., id.* § 1319(c)(1) (providing that any person who negligently violates the Act may be imprisoned for up to one year); *see also* 74 Fed. Reg. 626, 627 (Jan. 7, 2009) (authorizing fines up to $37,500 per violation per day).

**B.     The Agencies' Prior Definitions of "Waters of the United States"**

33.     For a century prior to the CWA, the Supreme Court interpreted the phrase "navigable waters of the United States" in the Act's predecessor statutes to refer to interstate waters that are "navigable in fact" or readily susceptible of being rendered so. *See The Daniel Ball*, 10 Wall. 557, 563 (1871); *see also United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 406 (1940).

34.     In 1974, two years after passage of the CWA, the Corps adopted this traditional judicial definition for the Act's term "navigable waters." *See* 33 C.F.R § 209.120(d)(1) (1974) (defining "navigable waters" to mean "those waters of the United States which are subject to the ebb and flow of the tide, and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce"). In doing so, the Corps emphasized that "[i]t is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor." *Id.* § 209.260(e)(1).

35.     After a district court enjoined these regulations as too narrow, *see Natural Resources Defense Council, Inc. v. Callaway*, 392 F. Supp. 685, 686 (D.D.C. 1975), the Corps adopted a far broader definition of "waters of the United States." *See* 40 Fed. Reg. 31,324-31,325 (1975); 42 Fed. Reg. 37,144 (1977). The Corps' new regulations deliberately sought to extend the definition to the outer limits of Congress's commerce power. *See id.* at 37,144 n.2,

9

31,324-31,325 (defining "the waters of the United States" to include navigable waters and their tributaries, as well as non-navigable intrastate waters that could affect interstate commerce).

36.    In 1986, the Corps expanded its CWA jurisdiction even further by defining "the waters of the United States" to include traditional navigable waters, tributaries of those waters, wetlands adjacent to those waters and tributaries, and waters used as habitat by migratory birds that either are protected by treaties or cross state lines. *See* 51 Fed. Reg. 41,206 (Nov. 13, 1986).

**C.    The Supreme Court Limits the Agencies' Assertion of CWA Jurisdiction**

37.    The Supreme Court has reviewed the scope of the Agencies' definition of "waters of the United States" on three occasions and has twice rejected the Agencies' assertion of authority to regulate certain waters at issue.

38.    In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), the Court reviewed whether the Corps had properly classified as a "water of the United States" a Michigan wetland that was "characterized by saturated soil conditions and wetland vegetation [that] extended beyond the boundary of respondent's property to … a navigable waterway." *Id.* at 131.    The Court found the Corps' assertion of jurisdiction to be reasonable because the property was "part of a wetland that actually abuts on a navigable waterway." *Id.* at 132.

39.    In *Solid Waste Agency of Northern Cook County v. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001), the Court found that the CWA did not give the Corps jurisdiction to regulate an abandoned sand and gravel pit in northern Illinois that provided a habitat for migratory birds.    The Court explained that Congress did not authorize the Agencies to regulate "non-navigable, isolated, intrastate waters," such as seasonal ponds. *Id.* at 171.    The Court concluded that the Agencies could not regulate such isolated waters because it would invoke "the outer limits of Congress' power," have the effect of "altering the federal-state

framework by permitting federal encroachment upon a traditional state power," and raise "significant constitutional questions" about the CWA. *Id.* at 172-74.

40. Five years later, in *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court rejected the Corps' assertion of jurisdiction over four Michigan wetlands that were "near ditches or man-made drains that eventually empt[ied] into traditional navigable waters." *Id.* at 729.

41. Justice Scalia, writing for a four-justice plurality, found no CWA jurisdiction because "waters of the United States" include only (1) those "relatively permanent bod[ies] of water connected to traditional interstate navigable waters"; and (2) waters with a "continuous surface connection" to such permanent waters, making it difficult to determine where the water begins and ends. *Id.* at 739-42 (citation omitted). The plurality held that "waters of the United States" did *not* include "channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.*

42. Justice Kennedy, writing separately in concurrence, found no CWA jurisdiction over the wetlands at issue because "waters of the United States" include only (1) those waters that are "navigable in fact or that could reasonably be so made"; and (2) waters with a "significant nexus" to such navigable waters. To have such a "significant nexus," the water must "significantly affect the chemical, physical, and biological integrity of" those waters "more readily understood as 'navigable.'" *Id.* at 780. According to Justice Kennedy, the Agencies could not assert jurisdiction over all "wetlands (however remote)" or "a continuously flowing stream (however small)" or a wetland merely because its waters "eventually may flow into traditional navigable waters." *Id.* at 776-77.

43.     Following *Rapanos*, the Agencies issued guidance explaining the approach the Agencies would use to determine whether waters were subject to the CWA after *Rapanos*.  U.S. Envt'l Prot. Agency & U.S. Army Corps of Eng'rs, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States & Carabell v. United States (Dec. 2, 2008) ("2008 Guidance Document").  The Agencies recognized that further consideration of jurisdictional issues could be appropriate in the future, either through issuance of additional guidance or through rulemaking. *Id.*

## FACTUAL ALLEGATIONS

**A.     The Agencies Drastically Expand Their Jurisdiction by Redefining "Waters of the United States"**

44.     On April 21, 2014, the Agencies published for comment a proposed rule entitled "Definition of 'Waters of the United States' Under the Clean Water Act." *See* 79 Fed. Reg. 22,188 (Apr. 21, 2014) ("Proposed Rule").

45.     The Proposed Rule identified various categories of waters that would be "waters of the United States" by rule, such that no additional analysis would be required.  The Proposed Rule also identified various "other waters" that could be "waters of the United States" through a case-specific showing of a "significant nexus" with certain defined categories of waters. *Id.* at 22,188-22,189.

46.     Despite clear indications that these revised definitions would significantly expand the Agencies' jurisdiction over the nation's waters and impose widespread hardship on small businesses and small government jurisdictions (*e.g.*, counties, irrigation districts, and weed control districts), the Agencies certified under the RFA that the Proposed Rule would "not have a significant adverse economic impact on a substantial number of small entities, and therefore no regulatory flexibility analysis [was] required." *Id.* at 22,220; *see* 5 U.S.C. § 603(a) (requiring an

agency promulgating new rules to "prepare and make available for public comment an initial regulatory flexibility analysis" that "describe[s] the impact of the proposed rule on small entities").

47.     To make this RFA determination, however, the Agencies compared the impact of the Proposed Rule to those "under the existing regulations." *Id.*  They made this comparison despite the fact that the Agencies no longer operated under the 1986 regulations, but instead made jurisdictional determinations pursuant to the 2008 Guidance Document, which reflected the limitations imposed by the Supreme Court in *SWANCC* and *Rapanos*.

48.     On October 15, 2014 and November 12, 2014, the Chamber and NFIB, along with 373 groups representing a broad range of businesses, industries, and commercial interests from across the country, submitted comments to the Agencies expressing their strong opposition to the Proposed Rule.

49.     In their comments, the Chamber and NFIB explained that the Proposed Rule suffered from serious procedural defects under the APA and RFA; exceeded the Agencies' authority under the Clean Water Act and the U.S. Constitution; and would subject countless ordinary commercial, industrial, recreational, and residential activities to new layers of federal bureaucracy without any real benefit to water quality.  The Chamber and NFIB thus requested that the Agencies withdraw the Proposed Rule and develop new modifications to the regulations that would protect waters, encourage economic prosperity, and comply with statutory and constitutional requirements.

50.     Disregarding these comments, the Agencies published the Final Rule in the Federal Register on June 29, 2015. *See* 80 Fed. Reg. 37,054 (June 29, 2015).

51.     Like the Proposed Rule, the Final Rule identified various categories of waters that would be "waters of the United States" by rule, such that no additional analysis would be required, and categorized various additional waters (those not fitting in any of the defined categories) as possible "waters of the United States" through a case-specific showing of a "significant nexus" with certain waters. *Id.* at 22,188-22,189.

52.     Unlike the Proposed Rule, however, the Final Rule made significant changes to the way in which the Agencies would categorically define certain waters, such as "adjacent" waters, and would conduct their case-specific analysis of individual waters. *Compare* 79 Fed. Reg. 22,262 (Apr. 21, 2014), *with* 80 Fed. Reg. 37,104-106 (June 29, 2015).

53.     As with the Proposed Rule, the Agencies again certified that no regulatory flexibility analysis was needed because "fewer waters will be subject to the [CWA] under the rule than are subject to regulation under the existing regulations [and so] this action will not affect small entities to a greater degree than the existing regulations." 80 Fed. Reg. at 37,102.

**B.     The Final Rule Exceeds the Agencies' Statutory and Constitutional Authority**

54.     The Final Rule exceeds the Agencies' statutory authority and violates the Constitution in a number of respects.

The Final Rule's *Per Se* Coverage of All "Tributaries"

55.     The Final Rule states that all "tributaries" of three types of waters are *per se* "waters of the United States." 33 C.F.R. § 328.3(a)(5). These three types of waters are: (1) "[a]ll waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the

tide" ("Commerce Waters"); (2) "[a]ll interstate waters, including interstate wetlands" ("Interstate Waters"); and (3) "the territorial seas" ("Territorial Seas"). *Id.* § 328.3(a)(1)-(3).[1]

56.     The Final Rule defines "tributary" as "a water that contributes flow, either directly or through another water" to a Commerce Water, Interstate Water, or Territorial Sea and "is characterized by the presence of the physical indicators of a bed and bank and an ordinary high water mark." *Id.* § 328.3(c)(3). A water is defined as a tributary even if it has man-made or natural breaks of any length, "so long as a bed and banks and an ordinary high water mark can be identified upstream of the break." *Id.*

57.     Thus, under the Final Rule's new categorization for "tributaries," waters such as ponds, intermittent, perennial, or ephemeral streams, and normally dry channels will be classified as "waters of the United States" as long as (1) they "contribute flow" to a Commerce Water, Interstate Water, or Territorial Sea—no matter how minimal or infrequent the flow—and (2) the "physical indicators" of flow—a bed and banks and ordinary high water mark—can be established. *See* 40 C.F.R. § 230.3(s)(3)(iii). Importantly, these physical indicators can be established by the use of "desktop tools that provide for the hydrologic estimation of a discharge sufficient to create an ordinary high water mark." 80 Fed. Reg. 37,077 (June 29, 2015). In other words, if a computer model suggests that a feature has enough flow to create a bed and bank and ordinary high water mark, the Agencies can determine that that feature is a "tributary," even if the physical indicators have not been observed in the field.

58.     This purported exercise of authority by the Agencies is at odds with both Justice Scalia's plurality opinion and Justice Kennedy's concurrence in *Rapanos.*

---

[1]  The Final Rule amends the definition of "the waters of the United States" under 33 C.F.R. § 328, as well as 40 C.F.R. §§ 110, 112, 116, 117, 122, 230, 232, 300, 302, and 401.  For simplicity, Plaintiffs cite only 33 C.F.R. § 328, but their arguments apply to all C.F.R. sections amended under the Final Rule.

59. The Agencies' categorization of "tributaries" fails the plurality's test because it encompasses waters with *any* flow into "a relatively permanent body of water connected to traditional interstate navigable waters," even if that flow does not constitute a "*continuous surface connection.*" *Rapanos*, 547 U.S. at 742.

60. The categorization also fails Justice Kennedy's test because it sweeps in waters that do not "significantly affect the chemical, physical, and biological integrity" of "waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759.

### The Final Rule's *Per Se* Coverage of All "Adjacent" Waters

61. The Final Rule declares that all waters "adjacent" to five types of waters are *per se* "waters of the United States." 33 C.F.R. § 328.3(a)(6). These five types of waters are (1) Commerce Waters; (2) Interstate Waters; (3) Territorial Seas; (4) "all impoundments of waters otherwise identified as waters of the United States" ("Impoundments"); and (5) all "tributaries" of Commerce Waters, Interstate Waters, and Territorial Seas ("Tributaries," as described *supra* in paras. 55-60). *Id.* § 328.3(a)(7).

62. The Final Rule defines "adjacent" expansively to mean "bordering, contiguous, or *neighboring*" Commerce Waters, Interstate Waters, Territorial Seas, Impoundments, or Tributaries. *Id.* § 328.3(c)(1) (emphasis added). Waters are "adjacent" even when they are "separated by constructed dikes or barriers, natural river berms, beach dunes, and the like." *Id.*

63. The Final Rule similarly defines "neighboring" expansively to encompass three types of waters: (1) a water "located within 100 feet of the ordinary high water mark" of a Commerce Water, Interstate Water, Territorial Sea, Impoundment, or Tributary; (2) a water "located within the 100-year floodplain" of a Commerce Water, Interstate Water, Territorial Sea, Impoundment, or Tributary and "not more than 1,500 feet from the ordinary high water mark of such water"; and (3) a water "located within 1,500 feet of the high tide line of" a Commerce

16

Water, Interstate Water, or Territorial Sea and "all waters within 1,500 feet of the ordinary high water mark of the Great Lakes." *Id.* § 328.3(c)(2).

64.     For all three categories, the *entire* water is considered "neighboring" as long as "a portion [of the water] is located within" the relevant zones. *Id.*

65.     Thus, under the Final Rule's new categorization for "adjacent" waters, countless waters, wetlands, and normally dry lands will be classified as "waters of the United States" despite their complete detachment—both on a surface level and on a chemical, physical, and biological level—to any traditionally navigable water.

66.     This purported exercise of authority by the Agencies is at odds with both Justice Scalia's plurality opinion and Justice Kennedy's concurrence in *Rapanos.*

67.     This categorization of "adjacent" waters fails the plurality's test because it encompasses waters with no "continuous surface connection" to a "relatively permanent body of water connected to traditional interstate navigable waters." 547 U.S. at 742.

68.     The categorization also fails Justice Kennedy's test because it sweeps in waters that do not "significantly affect the chemical, physical, and biological integrity" of "waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759.

The Final Rule's *Per Se* Coverage of Intrastate Waters Based Solely Upon Their
Geographic Proximity to Non-Navigable Interstate Waters

69.     The Final Rule establishes *per se* jurisdiction over all waters "adjacent" to Interstate Waters. 33 C.F.R. § 328.3(a)(2), (6).

70.     But Interstate Waters encompass more than traditional navigable-in-fact waters. *See id.* § 328.3(a)(2).   Indeed, they encompass "*all* interstate waters, including interstate wetlands" and other interstate non-navigable waters. *Id.*

17

71.     Thus, under the Final Rule's new categorization for "adjacent" waters, intrastate waters will be classified as "waters of the United States" simply because they are located near or are "neighboring" non-navigable waters or wetlands that happen to cross state lines.

72.     This purported exercise of authority by the Agencies is at odds with both Justice Scalia's plurality opinion and Justice Kennedy's concurrence in *Rapanos*.

73.     This categorization of "adjacent" waters fails the plurality's test because it encompasses waters with no "continuous surface connection" to a "relatively permanent body of water connected to *traditional interstate navigable waters*." *Rapanos*, 547 U.S. at 742 (emphasis added).

74.     The categorization also fails Justice Kennedy's test because it sweeps in waters that do not "significantly affect the chemical, physical, and biological integrity" of "waters that are or were *navigable in fact* or that could reasonably be so made." *Id.* at 759 (emphasis added).

The Final Rule's Case-by-Case Coverage of Additional Waters

75.     In addition to categorically defining countless waters as "waters of the United States," the Final Rule gives the Agencies even more authority to determine on a case-specific basis that additional waters—*i.e.*, waters not already included in a *per se* category or specifically exempted—also are "waters of the United States." 33 C.F.R. § 328.3(7)-(8).

76.     The Final Rule declares that five types of waters—prairie potholes, Carolina bays and Delmarva bays, Pocosins, Western vernal pools, and Texas coastal prairie wetlands—will be "waters of the United States" if they have a "significant nexus" to a Commerce Water, Interstate Water, or Territorial Sea. For purposes of the significant nexus analysis, the Agencies will combine all of the same water types within five types of waters in the watershed that drains to the nearest Commerce Water, Interstate Water, or Territorial Sea. *Id.* § 328.3(7).

18

77.   The Final Rule defines "significant nexus" to mean "that a water, including wetlands, either alone or in combination with other similarly situated waters in the region, significantly affects the chemical, physical, *or* biological integrity of a" Commerce Water, Interstate Water, or Territorial Sea. *Id.* § 328.3(c)(5) (emphasis added).

78.   The Final Rule also declares that two additional types of waters—(1) all waters located within the 100-year floodplain of a Commerce Water, Interstate Water, or Territorial Sea, and (2) all waters located within 4,000 feet of the high tide line or ordinary high water mark of a Commerce Water, Interstate Water, Territorial Sea, Impoundment, or Tributary—will be "waters of the United States" if they have a "significant nexus" to a Commerce Water, Interstate Water, or Territorial Sea. For both categories, the *entire* water is considered a "water of the United States" as long as "a portion [of the water] is located within" the relevant zones. *Id.* § 328.3(8). The Agencies admit that "the vast majority of the nation's water features are located within 4,000 feet" of a Commerce Water, Interstate Water, Territorial Sea, Impoundment, or Tributary. *See* Economic Analysis of the EPA-Army Clean Water Rule, U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, 11 (May 2015).

79.   This purported exercise of authority by the Agencies is at odds with both Justice Scalia's plurality opinion and Justice Kennedy's concurrence in *Rapanos*.

80.   This case-specific approach fails the plurality's test because it encompasses waters with no "continuous surface connection" to a "relatively permanent body of water connected to *traditional interstate navigable waters.*" *Rapanos*, 547 U.S. at 742 (emphasis added).

81.   The categorization also fails Justice Kennedy's test, which would permit jurisdiction only over waters that "significantly affect the chemical, physical, *and* biological

integrity" of "waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (emphasis added). In addition, Justice Kennedy's test would not permit aggregation of waters across amorphous "region[s]," as the Final Rule asserts the Agencies will do. *Id.*

**C.     The Final Rule Will Severely Harm Plaintiffs and Their Members**

82.     Despite the Agencies' written and oral assurances that the Final Rule will have no substantive regulatory impact and will actually reduce the areas subject to federal jurisdiction, the available evidence shows the opposite to be true.

83.     EPA itself has developed maps indicating that more than 8.1 million miles of rivers and streams across the 50 States could be identified as new "waters of the United States" under the Final Rule. *See* Press Release, House Committee on Science, Space & Technology, *Smith: Maps Show EPA Land Grab*, Aug. 27, 2014. This expansion contrasts sharply with the prior EPA estimate of only 3.5 million miles of rivers and streams categorized as "waters of the United States." *See* EPA Office of Water, National Water Quality Inventory: Report to Congress, EPA 841-R-08-001 (Jan. 2009).

84.     Likewise, analyses by the States of their own waters reveal that the Final Rule would greatly expand the amount of stream miles classified as "waters of the United States." For example, the State of Kansas has estimated that the inclusion of "ephemeral" streams as "waters of the United States" would increase the amount of jurisdictional stream miles from 32,000 to 134,000 miles, an increase of over 400 percent. *See* Letter to Nancy Stoner, Acting Assistant Administrator for Water, EPA, from Sam Brownback, Governor of Kansas (July 14, 2011).

85.     This expansion of federal authority will have serious consequences for Plaintiffs and their members. Under the Final Rule, virtually any business that owns or operates a facility or has property could be adversely affected, particularly if it has ditches, retention ponds for storm water runoff, fire/dust suppression ponds, or other surface impoundments on site.

86.     If the Final Rule becomes effective, any business with lands covered by the Rule's expanded definition of navigable waters will immediately be prohibited by law from discharging any "pollutant," defined broadly to include not only traditional contaminants but also solids such as "dredged soil, ... rock, sand, [and] cellar dirt." This prohibition is itself a cognizable injury.

87.     While businesses may seek a permit to authorize the discharge of "pollutants" into "navigable waters," the costs of a permit will in many cases be prohibitive, which will force Plaintiffs' members to abandon valuable projects and activities entirely.

88.     Where businesses do seek federal permits, the costs and delays associated with obtaining those permits will increase drastically for affected businesses. Indeed, the Agencies themselves estimate that CWA permitting costs would increase between $19.8 and $52.0 million annually and that mitigation costs would rise between $59.7 and $113.5 million annually. *See Economic Analysis of Proposed Revised Definition of Waters of the United States*, U.S. Environmental Protection Agency and U.S. Army Corps of Engineers, 13 (Mar. 2014).

89.     This increase would be on top of the costs already imposed by CWA permitting requirements. The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes. In addition, over $1.7 billion is spent each year by the private and public sectors to obtain wetlands permits. *See* Sunding & Zilberman, *The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process*, 42 Natural Resources J. 59, 74-76 (2002).

90.     These harms are particularly pervasive because the Rule relies on definitions and concepts that lack sufficient clarity to provide meaningful guidance to the regulated parties in

determining whether waters fall within federal jurisdiction. Thus, while the Final Rule in many cases will clearly apply to lands beyond the reach of the CWA, it will also arguably apply in an even broader swath of cases—cases as innocuous as a landowner seeking to drain storm water from a depression that might (or might not) be considered a puddle, or wishing to dig holes for a fence post in an area that retains waters after storms. This ambiguity, coupled with the severe penalties for a violation of the Act will chill an even greater range of previously unregulated conduct.

91. In sum, there is no question that the Final Rule will cause Plaintiffs and their members to suffer serious harms, including a prohibition—enforced by severe criminal and civil penalties—on previously unregulated activities, increased permitting costs, depreciation in the value of affected properties, and substantial delays of their business activities.

## CLAIMS FOR RELIEF

### COUNT ONE
### The Final Rule Exceeds the Agencies' Authority Under the Clean Water Act

92. Plaintiffs repeat and re-allege paragraphs 1-91 as if fully set forth herein.

93. The Clean Water Act authorizes the Agencies to assert jurisdiction only over "navigable waters," defined as "waters of the United States." 33 U.S.C. §§ 1311(a), 1342(a), 1344(a), 1362(7), (12).

94. The Final Rule exceeds the Agencies' authority under the Clean Water Act because it confers jurisdiction to the Agencies over waters that are not "navigable waters."

95. The Final Rule also exceeds the Agencies' authority because it fails to provide fair notice of what conduct is prohibited by the civil and criminal provisions of the Clean Water Act and grants overly broad enforcement discretion to Defendants.

96.     Accordingly, the Final Rule must be set aside under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

## COUNT TWO
### The Final Rule Exceeds the Agencies' Authority
### Under Article I of the U.S. Constitution

97.     Plaintiffs repeat and re-allege paragraphs 1-96 as if fully set forth herein.

98.     The federal government has no general police power and may exercise only those powers expressly granted to it by the Constitution or those that are implied as reasonably "necessary and proper" to carry out the granted powers. *See* U.S. Const. art. I, § 8, cl. 18; *id.* amend. X; *United States v. Lopez*, 514 U.S. 549, 566 (1995).

99.     The Clean Water Act was enacted pursuant to Congress's authority under the Commerce Clause "to regulate commerce with foreign nations, and among the several states." U.S. Const. art. I, § 8.

100.     The Final Rule violates the Constitution because it will subject to federal regulation thousands of miles of intrastate waters that have no substantial effect on interstate commerce.

101.     Accordingly, the Final Rule must be set aside under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

## COUNT THREE
### The Final Rule Violates State Sovereignty Reserved Under the Tenth Amendment

102.     Plaintiffs repeat and re-allege paragraphs 1-101 as if fully set forth herein.

103.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution … are reserved to the States respectively, or to the people." U.S. Const. amend. X.

104.    The federal system "protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions.  By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011).

105.    "If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may … challenge [the] law as enacted in contravention of constitutional principles of federalism." *Id.*

106.    Among the powers reserved to the States under the Tenth Amendment is the authority to regulate intrastate land use and water resources.  *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994); *see also SWANCC*, 531 U.S. at 174 (recognizing the "States' traditional and primary power over land and water use").

107.    The CWA itself recognizes that the States have "the primary responsibilities and rights … to plan the development and use … of land and water resources." 33 U.S.C. § 1251(b).

108.    The Supreme Court requires a "clear and manifest" statement from Congress to authorize an unprecedented intrusion into traditional state authority." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994).

109.    The Final Rule's attempt to expand federal jurisdiction by redefining "waters of the United States" thus violates the States' sovereignty reserved under the Tenth Amendment and infringes Plaintiffs' liberty interests protected by federalism.

110.    Accordingly, the Final Rule must be set aside under the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; [and] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

**COUNT FOUR**
**The Final Rule Is Arbitrary and Capricious in Violation of**
**the Administrative Procedure Act**

111.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

112.    The APA requires federal administrative agencies to engage in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. __ (2015) (slip op. at 5). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* "Courts enforce this principle with regularity when they set aside agency regulations which, though well within the agencies' scope of authority, are not supported by the reasons that the agencies adduce." *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

113.    The Final Rule is arbitrary and capricious because the evidence in the record does not support the Agencies' new *per se* and case-specific jurisdictional classifications for "waters of the United States."

114.    The Final Rule is also arbitrary and capricious because it relies on definitions and concepts that lack sufficient clarity to provide meaningful guidance to the regulated parties in determining whether waters fall within federal jurisdiction.

115.    The Final Rule is also arbitrary and capricious because it is vague and fails to put regulated parties on notice of when their conduct violates the law. Plaintiffs cannot reasonably determine based on the face of the relevant statutes and regulations what is required of them.

The Final Rule's definitions of tributaries, adjacency, and significant nexus, among others, are unconstitutionally vague, violate due process, and are not authorized by the Clean Water Act.

116.    Accordingly, the Final Rule must be set aside under the APA because it is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A).

**COUNT FIVE**
**The Final Rule Violates the Notice and Comment Requirements of**
**the Administrative Procedure Act**

117.    Plaintiffs repeat and re-allege paragraphs 1-116 as if fully set forth herein.

118.    The APA provides that before an agency conducts a "rulemaking," it must provide a "[g]eneral notice of proposed rule-making" and give "interested persons an opportunity to participate in the rule-making through submission of written data, views or arguments." 5 U.S.C. § 553(b)-(c).  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

119.    If a final rule is not the "logical outgrowth" of the proposed rule, the rule is invalid for a failure to provide adequate notice and opportunity to comment. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007).

120.    The Final Rule does not satisfy the "logical outgrowth" test because the Proposed Rule did not give interested parties sufficient notice regarding how it would define certain waters as *per se* jurisdictional and how it would assess certain waters on a case-specific basis.

121.    Plaintiffs were prejudiced by the Agencies' denial of the opportunity to comment on the identification of certain waters as per se jurisdictional and on the case-by-case assessment of other waters.

122.    Accordingly, the Final Rule must be invalidated under 5 U.S.C. §§ 702, 706(2)(A), (C), (D).

## COUNT SIX
### The Final Rule Violates the Regulatory Flexibility Act

123.    Plaintiffs repeat and re-allege paragraphs 1-122 as if fully set forth herein.

124.    The RFA requires an agency to conduct a regulatory flexibility analysis whenever that agency is required to publish a general notice of proposed rulemaking for any proposed rule. 5 U.S.C. § 603.

125.    During the notice and comment period for this matter, NFIB and the Chamber submitted comments to the docket addressing the Agencies' failure to comply with the requirements of the RFA and requesting that they comply prior to the issuance of the Final Rule. NFIB also submitted a Freedom of Information Act request to the Agencies in an attempt to ascertain whether they had conducted any economic analysis or serious consideration of the Proposed Rules' impact on small businesses.   EPA's official response was that it had no responsive documents, which suggests that EPA did not take seriously its duty to consider potential small business impacts.

126.    The Agencies also ignored the Small Business Administration's recommendation that they conduct a full analysis under the RFA.

127.    The Agencies violated the RFA by failing to conduct the analyses required in connection with their promulgation of the Final Rule and by improperly certifying that no regulatory flexibility analysis was needed based on their conclusion that the Final Rule "will not have a significant economic impact on a substantial number of small entities."   80 Fed. Reg. at 37,102. The Agencies made numerous errors in issuing this certification, including: (a) finding that the Final Rule "will not affect small entities to a greater extent than the existing regulations";

27

(b) finding that the Final Rule will not "'subject' any entities of any size to any specific regulatory burden"; (c) ignoring the increased costs that the Final Rule will directly impose on small businesses; and (d) failing to convene a small business advocacy review panel to assess the Final Rule's impact on small businesses.

128.    Plaintiffs are entitled to relief under the RFA because many of their members are small entities that are adversely affected and aggrieved by the Final Rule. *See* 5 U.S.C. § 611.

129.    Because the Final Rule will impose significant costs on small businesses, the Final Rule should be enjoined from becoming effective until Defendants conduct a regulatory flexibility analysis in accordance with the RFA.  5 U.S.C. § 611.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and:

(a)    Declare that the Final Rule is unlawful because it (1) exceeds the Agencies' authority under the Clean Water Act; (2) exceeds their authority under Article I of the Constitution of the United States; (3) violates State sovereignty reserved under the Tenth Amendment to the Constitution of the United States; (4) violates the Administrative Procedure Act; and (5) violates the Regulatory Flexibility Act;

(b)    Vacate and set aside the Final Rule in its entirety;

(c)    Issue preliminary and permanent injunctive relief prohibiting Defendants from using, applying, enforcing, or otherwise proceeding on the basis of the Final Rule;

(d)    Award Plaintiffs their costs of litigation, including reasonable attorney's fees; and

(e)    Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated:  July 10, 2015

Respectfully submitted,

By:

Steven P. Lehotsky*
Warren Postman*
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, NW
Washington, DC 20062
Tel: (202) 463-5337
Email: slehotsky@uschamber.com
Email: wpostman@uschamber.com

*Counsel for Plaintiff Chamber of
Commerce of the United States of
America*

Karen R. Harned*
Luke A. Wake*
NFIB SMALL BUSINESS LEGAL CENTER
1201 F Street, NW, Suite 200
Washington, DC 20004
Tel: (202) 314-2048
Email: karen.harned@nfib.org
Email: luke.wake@nfib.org

Andrew D. Herman*
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005
Tel: (202) 626-5869
Email: aherman@milchev.com

*Counsel for Plaintiff National
Federation of Independent Business*

James P. McCann, OBA No. 5865
John J. Carwile, OBA No. 10757
Mary E. Kindelt, OBA No. 21728
MCDONALD, MCCANN, METCALF &
CARWILE, LLP
15 E. Fifth Street, Suite 1400
Tulsa, OK 74103
Tel: (918) 430-3700
Email: jmccann@mmmsk.com
Email: jcarwile@mmmsk.com
Email: mkindelt@mmmsk.com

William S. Consovoy*
Thomas R. McCarthy*
J. Michael Connolly*
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
Tel: (703) 243-9423
Email: will@consovoymccarthy.com
Email: tom@consovoymccarthy.com
Email: mike@consovoymccarthy.com

Michael H. Park*
CONSOVOY MCCARTHY PARK PLLC
3 Columbus Circle, 15th Floor
New York, NY 10019
Tel: (212) 247-8006
Email: park@consovoymccarthy.com

*Counsel for Plaintiffs Chamber of
Commerce of the United States of
America, National Federation of
Independent Business, State Chamber
of Oklahoma, Tulsa Regional
Chamber, and Portland Cement
Association*

\* Application for admission *pro hac vice* pending

29