**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | |
| (2) NATIONAL FEDERATION OF INDEPENDENT BUSINESS, | |
| (3) STATE CHAMBER OF OKLAHOMA, | |
| (4) TULSA REGIONAL CHAMBER, and | |
| (5) PORTLAND CEMENT ASSOCIATION, | |
| Plaintiffs, | No. 4:15-cv-386-CVE-PJC |
| v. | (Related: No. 4:15-cv-381-CVE-FHM) |
| (1) UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | ORAL ARGUMENT REQUESTED |
| (2) GINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency, | |
| (3) UNITED STATES ARMY CORPS OF ENGINEERS, and | |
| (4) JO-ELLEN DARCY, in her official capacity as Assistant Secretary of the Army (Civil Works), | |
| Defendants. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STAY

The Chamber of Commerce of the United States of America, National Federation of Independent Business, State Chamber of Oklahoma, Tulsa Regional Chamber, and Portland Cement Association ("Plaintiffs") respectfully submit this brief in opposition to the Motion to Stay Proceedings Pending a Ruling from the Judicial Panel on Multi-District Litigation under 28 U.S.C. § 1407 to Transfer and Consolidate ("Stay Motion") filed by the United States

Environmental Protection Agency ("EPA"), Gina McCarthy, in her official capacity as Administrator of the EPA, the United States Army Corps of Engineers ("Corps"), and Jo-Ellen Darcy, in her official capacity as Assistant Secretary of the Army (Civil Works) ("Defendants").

## INTRODUCTION

Defendants ask the Court to stay Plaintiffs' case on the basis of a motion to transfer to the Judicial Panel on Multidistrict Litigation ("JPML" or "MDL Panel") under 28 U.S.C § 1407 that they have not even filed.  For three reasons, this Court should not stay the current proceedings.

*First*, a stay would not save judicial resources.  Defendants' main argument is that the cases present similar *legal* issues over the validity of the Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) ("Final Rule").  But transfer and consolidation by the JPML is not appropriate when the actions "by and large, raise strictly legal issues."  *In re Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009).  Nor can this Court grant a stay based merely on Defendants' representation that a motion to transfer and consolidate will be filed "soon."  Similarly, the filing of petitions for review in different courts of appeals under 33 U.S.C. § 1369 also does not warrant a stay. Plaintiffs filed the petitions for review because "careful lawyers must apply for judicial review [in the court of appeals] of anything even remotely resembling a reviewable order" under 33 U.S.C. § 1369(b)(l)).  Compl. ¶ 26 (quoting *Am. Paper Inst, Inc. v. EPA*, 882 F.2d 287, 288 (7th Cir. 1989)).  As the Complaint makes clear, however, these disputes belong in the district courts, not the courts of appeals.  *Id*.  Remarkably, Defendants do not even argue otherwise.

*Second*, Plaintiffs will suffer significant harm if this litigation is stayed.  The Final Rule is slated to take effect on August 28, 2015—approximately one month from now.[1]  Once the

---

[1] The Agencies do have the authority voluntarily to "postpone the effective date of [the Rule], pending judicial review."  5 U.S.C. § 705.  If the Agencies were to exercise this authority to postpone the

Final Rule takes effect, Plaintiffs' members will be forced to delay or cancel plans to improve their properties, resulting in permanent lost value and foregone profits. *See* Plaintiffs' Motion for a Preliminary Injunction (filed concurrently with this opposition). This economic harm is "irreparable per se" because Plaintiffs cannot recover damages from Defendants due to sovereign immunity. *See Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010), *aff'd sub nom*, *Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010). Defendants have not yet initiated MDL proceedings, and it is highly unlikely that such proceedings would be resolved before the Final Rule takes effect. Indeed, it may well take months for the JPML to review and adjudicate Defendants' motion to transfer and consolidate. By that time, the Final Rule will have taken effect, and the harm caused by Defendants' approach likely would be irreversible.

*Finally*, Defendants are unlikely to suffer any hardship or prejudice if the stay is denied. Because the overlap in the lawsuits challenging the Final Rule is primarily *legal* in nature, Defendants will not suffer the harms that normally warrant transfer to an MDL court, such as "duplicative and burdensome discovery." *In re Medi-Cal*, 652 F. Supp. 2d at 1378. The fact that the cases present overlapping legal arguments means that Defendants would actually benefit from economies of scale by repurposing their briefs for each case. Indeed, Defendants' professed concern is not any burden of duplicative discovery or briefing, but the prospect of district courts issuing inconsistent rulings. Transfer and consolidation is not warranted, however, "[m]erely to avoid two federal courts having to decide the same issue." *Id*. Multiple federal courts routinely address cases raising similar legal issues, and this is a *benefit* of the federal judicial system, not a problem to be avoided. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2597 (2015) (identifying dozens of cases before the district courts, courts of appeals, and state

---

effective date of the Rule until the conclusion of review proceedings, Plaintiffs would no longer face the threat of irreparable injury and would withdraw their opposition to Defendants' motion to stay.

courts on the issue of same-sex marriage and noting their importance in helping "to explain and formulate the underlying principles this Court now must consider").

Because a stay will yield no judicial efficiencies and cause substantial harm to Plaintiffs, the Court should deny the Stay Motion.  At the very least, the Court should not decide the Stay Motion until it has resolved Plaintiffs' motion for a preliminary injunction.  Alternatively, Plaintiffs would withdraw their opposition to a stay if Defendants would agree to postpone the effective date of the Final Rule, which otherwise becomes effective on August 28, 2015.  Absent such a voluntary postponement by the Agencies, the Court should not allow Defendants to delay legal challenges to the Final Rule, knowing that it will soon become effective and impose irreparable injury on Plaintiffs.  Plaintiffs seek only to maintain the status quo while the Court rules on the legality of the Final Rule.

## BACKGROUND

On July 10, 2015, Plaintiffs filed suit against Defendants, seeking declaratory and injunctive relief because the Final Rule exceeds Defendants' authority under (1) the Clean Water Act; (2) the Commerce Clause and the Necessary and Proper Clause; (3) the Tenth Amendment; (4) the Administrative Procedure Act; and (5) the Regulatory Flexibility Act.  Compl. ¶¶ 22-28.  On July 15, 2015, Plaintiffs requested that this Court consolidate this action with a previously filed, related action also pending in this Court: *Oklahoma v. EPA*, No. 15-CV-381-CVE-FHM.

Before the Court ruled on that motion, on July 20, 2015 Defendants filed the separate Stay Motion pending a ruling on an as-yet unfiled Section 1407 Motion to Transfer and Consolidate.  *See* Stay Motion (Doc. 25); *id.* at 4 n.1 (identifying ten similar cases in eight district courts[2]).  In addition to this Opposition, Plaintiffs simultaneously filed their Motion for a

---

[2] In apparent recognition of the urgency of plaintiffs' claims in these cases, the District Court for the Southern District of Georgia has set an expedited briefing schedule for plaintiffs' motion for a

Preliminary Injunction to seek relief from the irreparable harm Plaintiffs and their members will suffer because of the Final Rule.

## ARGUMENT

This Court has a "virtually unflagging obligation" to exercise the jurisdiction given to it. *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015); *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (federal courts have a "strict duty to exercise the jurisdiction that is conferred upon them by Congress").  Although the Court has the inherent discretion to stay a case, this discretion should "be used sparingly and only upon a clear showing by the moving party of hardship or inequity so great as to overbalance all possible inconvenience of the delay to [the] opponent."  *Nelson v. Granite State Ins. Co.*, No. 08-cv-1165, 2010 WL 680878, at *1 (W.D. Okla. Feb. 25, 2010).

In determining whether to stay a case pending a decision by the MDL Panel, a district court typically considers three factors: (1) the judicial resources that would be saved by avoiding duplicative litigation if the cases are consolidated; (2) potential prejudice to the non-moving party; and (3) hardship and inequity to the moving party if the action is not stayed.  *Wishon v. Monsanto Co.*, No. 13-cv-770, 2013 WL 5596319, at *1 (W.D. Okla. Oct. 11, 2013); *Jozwiak v. Stryker Corp.*, No. 09-cv-1985, 2010 WL 147143, at *1 (M.D. Fla. Jan. 11, 2010).  But these are not co-equal factors.  The proponent of a stay "must make out a clear case of hardship or inequity in being required to go forward, *if there is even a fair possibility that the stay for which he prays will work damage to someone else*."  *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936) (emphasis added).  Further, a stay is especially difficult to secure in cases where the plaintiff has

___

preliminary injunction in *Georgia v. McCarthy*, No. 15-79 (S.D. Ga.), with oral argument scheduled for August 12, 2015.  Doc. 33 (July 21, 2015).  There is also pending in that court a motion for a stay from the defendants.  Plaintiffs respectfully submit that a similar schedule for the motion for a preliminary injunction would be appropriate in this case.  Any oral argument on that motion could be combined with any argument on Defendants' motion for a stay.

"alleged … continuing harm and sought … injunctive or declaratory relief." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005).  Such cases are distinguishable from those in which only damages are at issue.  *Id.*

The MDL rules do not change this standard.  Indeed, JPML Rule 2.1(d) specifically provides that a motion for transfer and consolidation "does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court."  In other words, "'a district judge should not automatically stay discovery, postpone rulings on pending motions, or generally suspend further rulings upon a party's motion to the MDL Panel for transfer and consolidation.'"  *Jozwiak*, 2010 WL 147143, at *2 (quoting *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997)).  Indeed, district courts frequently deny motions to stay while transfer motions are pending before the MDL Panel.  *See, e.g.*, *Greene v. Wyeth*, 344 F. Supp. 2d 674, 679 (D. Nev. 2004); *Wishon*, 2013 WL 5596319, at *2.  And of course here, Defendants have not even filed a transfer motion—they have merely stated their apparent intention to do so.  Their inchoate representation is not sufficient to prevent this Court from granting Plaintiffs preliminary injunctive relief.

I.     **A Stay Would Save No Judicial Resources Because the MDL Panel Is Not Likely To Grant Consolidation and These Disputes Do Not Belong in the Courts of Appeals.**

Defendants assert that this action should be transferred and consolidated with similar actions pending in other district courts.  But it is highly unlikely that such consolidation will occur, even when Defendants file such a motion. This weighs heavily against granting the motion to stay.  *See Woodrum v. Integris Health, Inc.*, No. 04-835 (W.D. Okla. Aug. 16, 2004) (Doc. 26) (denying a motion to stay in part because "[a]fter reviewing the amended complaint filed by plaintiffs, the court finds it less than obvious that this case will be approved for transfer

to the MDL court," as the legal issues "may not be susceptible to the type of coordinated rulings contemplated by an MDL court").

To begin, Defendants conspicuously fail to identify the statute or standards under which such a transfer would be granted. *See* Stay Motion at 4-6. The MDL statute provides that "when civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). The MDL Panel will grant the transfer only if it determines that doing so would be "for the convenience of parties and witnesses" and would "promote the just and efficient conduct of such actions. *Id*. The moving party bears the burden of demonstrating the need for transfer and consolidation. *See In re Best Buy Co.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011) (denying transfer and consolidation because "the proponents of centralization have not met their burden of demonstrating the need for centralization").

Defendants cannot carry this burden. Defendants' primary argument for a stay is that the actions raise similar *legal* issues; namely, whether the Final Rule is invalid "under the Administrative Procedure Act, the Clean Water Act, and the United States Constitution." Stay Motion at 6. But "[t]he presence of common issues of law has no effect on transfer: it is neither a necessary nor sufficient condition for transfer." Multidistrict Litig. Manual § 5.4. "Where the issues in a case are primarily legal in nature, even though some fact issues may exist, the Panel is nearly certain to conclude that transfer is not appropriate." *Id.*; *see also, e.g.*, *In re Medi-Cal*, 652 F. Supp. 2d at 1378 (denying transfer and consolidation where the actions "by and large, raise strictly legal issues"); *In re Real Estate Transfer Tax Litig.*, 895 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012) (denying transfer and consolidation because the dispute involves "primarily a *legal* question—*i.e.*, are the [parties] statutorily exempt from liability for real estate transfer

taxes") (emphasis in original); *In re Multijurisdiction Practice Litig.*, 52 F. Supp. 3d 1377, 1378 (J.P.M.L. 2014) ("While each action focuses on the constitutionality of restrictions on attorney admission contained in each court's local rules these common legal questions are insufficient to satisfy Section 1407's requirement of common factual questions."); *In re EPA Pesticide Listing Confidentiality Litig.*, 434 F. Supp. 1235, 1236 (J.P.M.L. 1977) (denying transfer and consolidation because "the predominant, and perhaps only, common aspect in these actions is a legal question of statutory interpretation").

Moreover, there are no disputed "common *questions* of fact" that would need to be resolved by the MDL court.  28 U.S.C. § 1407(a) (emphasis added).  In this case, which is governed entirely by the administrative record, there should not be "duplicative and burdensome discovery," *In re Medi-Cal*, 652 F. Supp. 2d at 1378, as discovery in this action is unnecessary. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record.").  Defendants themselves describe these disputes as "substantially similar *facial* challenges to the Clean Water Rule."  Stay Motion at 2 (emphasis added).  These cases simply do not resemble those that are typically transferred and consolidated by the JPML.  *See* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3861 (4th ed.) (noting that the MDL statute grew out of courts' experience dealing with cases of "great[] complexity," such as those following a successful criminal antitrust prosecution of electrical equipment manufacturers involving "more than 1,800 civil damage actions in thirty-

three federal districts").  It is no surprise, then, that Defendants cite no cases in which plaintiffs challenged similar agency actions before an MDL court.[3]

In addition, Defendants seek a stay despite the fact that they have yet to file any motion with the MDL Panel and promise only that such a motion will be filed "soon" and is "forthcoming."  *See* Stay Motion at 2.  The court should not stay the litigation on the mere promise that Defendants will, at some point in the future, seek to transfer this case to a MDL court.  *See Utah v. Eli Lilly & Co.*, 509 F. Supp. 2d 1016, 1019-20 & n.9 (D. Utah 2007) ("[T]he Court notes that, as of now, this action is not properly characterized as MDL litigation, but merely proposed as potential MDL litigation…. The Court notes the absence in the docket of any request by Defendant to the JPML…. Addressing Plaintiff's Motion to Remand is even more justified here, where the case is not yet properly MDL litigation and nothing from the case is pending before the MDL."). Indeed, none of Defendants' caselaw supports granting a motion to stay *before* a motion with the MDL Panel has even been filed.  *See* Stay Motion at 5.

Defendants also suggest that a stay is appropriate because multiple parties have filed petitions for review of the Final Rule in circuit courts of appeals pursuant to 33 U.S.C. § 1369(b)(1), which grants review of an EPA action "promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title."  *See* Stay Motion at 7.  But Defendants cite no authority suggesting that these petitions for review should take precedence

---

[3] Plaintiffs are aware of only one case even remotely similar.  *See In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 78 (D.D.C. 2011) (MDL court addressing actions challenging Fish and Wildlife Service's decision to list polar bear as threatened under Endangered Species Act).  Importantly, most of the parties in that case supported transfer and consolidation.  *See id.* (Doc. 1 at 1-2 (Dec. 4, 2008)).  Although the plaintiffs in the other pending actions have yet to indicate their position on the motion to stay, it is unlikely that they will support transfer and consolidation.  This too would support denying the motion to transfer and consolidate.  *See* Wright & Miller § 3863 ("[W]hen most or all of the nonmoving parties are opposed to MDL transfer, the Panel will probably deny the motion, especially if no nonmoving party supports consolidation."); *see, e.g.*, *In re Property Assessed Clean Energy (Pace) Programs Litig.*, 764 F. Supp. 2d 1345, 1347 (J.P.M.L. 2009) (denying centralization in part because "the bulk of the parties—plaintiffs in all actions—oppose centralization").

over the district court cases.  Nor can they.  Most plaintiffs (including Plaintiffs here) clarified they believed jurisdiction belonged in the district court, but that they were filing petitions for review only as a protective measure.  *See, e.g.*, Compl. ¶¶ 7-8, 26.  Precautions aside, the jurisdiction of this court is clear.  As the court explained in *Northwest Environmental Advocates v. EPA*:

> We do not lightly hold that we have jurisdiction under section 509(b)(1).  We have counseled against its expansive application.  The specificity and precision of section 509, and the sense of it, persuade us that it is designed to exclude EPA actions that Congress did not specify.  Indeed, no sensible person would speak with such detail otherwise.

537 F.3d 1006, 1015 (9th Cir. 2008) (citations and alterations omitted).  Indeed, Defendants themselves never claim that jurisdiction is proper in the courts of appeals.

## II.     Plaintiffs Will Suffer Prejudice If the Stay Is Granted.

As further detailed in Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' members are facing imminent and irreparable harms.  The Final Rule will immediately harm landowners with waters on their property, including Plaintiff NFIB's members, by forcing them to submit to expensive and time-consuming federal permitting requirements in order to conduct routine activities on their property.  *See* Plaintiffs' Motion for Preliminary Injunction at 19-24.  Moreover, given the costly and burdensome requirements of complying with federal regulations, many individuals and small business owners will simply forego their plans for improving their property, as the modest benefits they hoped to achieve will not outweigh the substantial costs.

For example, Michael Jacobs, an NFIB member from Delaware County, Oklahoma, owns a 50-acre plot of land adjacent to his home that is largely undeveloped.  *See* Jacobs Declaration ¶ 5 (Ex. A).  Before the Final Rule, Mr. Jacobs had planned to clear his property for cattle grazing and other farming purposes—improvements that would "greatly increase the value of the property" and allow him to one day "sell the property or give it to one of [his] children so that

they [could] build a home on the property." *Id.* ¶¶ 7-8.  Mr. Jacobs had anticipated beginning

this work in September or October of this year.  *Id*. ¶ 8. After his property was cleared, he

"intended to raise about 30 cattle on the property[,] … take these cattle to market in the summer

or fall of 2016 and, hopefully, realize a sizable return on [his] investment." *Id*.

But because Mr. Jacobs's property contains a small creek bed—which is usually about 5-

6 inches deep but "will often go dry"—this parcel of land will likely be classified as a "tributary"

under the Final Rule.  *Id*. ¶¶ 14, 20.  As a result, Mr. Jacobs "will be forced to halt all plans for

improving [his] property because the rule would require [him] to obtain a costly permit from the

federal government" before making critical improvements to his property, such as impounding

water for cattle.  *Id.* ¶ 22.  The profits that Mr. Jacobs "hoped to realize in the summer or fall of

2016 from cattle sales will be forever lost." *Id*. ¶ 26.  Due to the Final Rule, Mr. Jacobs "will

have to forego this investment opportunity and will be unable to use the land for these and other

business purposes." *Id*.

The Final Rule is already devaluing land that represents the bulk of many families'

assets.  For example, Leo Stevens, an NFIB member and life-long resident of Rogers County,

Oklahoma, owns a home with a small creek at the back of his property. Stevens Declaration ¶¶ 3-

4 (Ex. B).  Even though this creek is dry about a third of the year, because water runs through it

at other times of the year Mr. Stevens believes this parcel of property is now subject to regulation

under the Final Rule. *Id*. ¶¶ 5, 6, 8.  Much of Mr. Stevens' land's value "comes from its

potential. For example, one day [he] would like to build a home on it for one of my children or

grandchildren. Others might use it for farming or for recreation." *Id*. ¶ 9.  But these potential

uses are greatly curtailed because Mr. Stevens believes he now has "to ask permission from the

federal government to do routine activities, such as drilling a posthole, filling a gully, or

maintaining a septic system." *Id.* ¶ 10.  Obtaining a federal permit is "an enormous burden and

expense." *Id.*  His property, which is the "culmination of [his and his wife's] life's work and

represents a substantial part of [their] savings," has been immediately devalued by the Final

Rule. *Id.* ¶ 14.

If this rule takes effect, numerous businesses will be forced to undergo the expense of

applying for a CWA permit, and countless land owners and small businesses will be forced to

delay or cancel plans to improve their properties, resulting in permanent lost value and foregone

profits. *See, e.g., id.* ¶ 10; Jacobs Dec. ¶¶ 7, 8, 25.  This economic harm is "irreparable per se"

because Plaintiffs cannot recover damages from Defendants due to sovereign immunity.  *See,*

*e.g., Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *Cal.*

*Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 849, 852 (9th Cir. 2009); *Temple Univ. v.*

*White*, 941 F.2d 201, 215 (3d Cir. 1991); *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62,

77 (D.D.C. 2010), *affirmed sub nom., Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

("[E]ven if the claimed economic injury did not threaten plaintiffs' viability, it is still irreparable

because plaintiffs cannot recover money damages against FDA.").

Moreover, in light of Defendants' failure to comply with their obligations under the

Regulatory Flexibility Act ("RFA"), granting their request for a stay would create additional

prejudice.  The RFA requires Defendants to determine whether the Final Rule has a "significant

economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).  Despite the

clear economic harms described in the paragraphs above, Defendants improperly declined to

conduct a Regulatory Flexibility Analysis.  Granting a stay at this juncture would prolong the

period during which the Final Rule would impose these harms while Defendants remained in

violation of their RFA obligations.

Despite the immediate harms Plaintiffs face, Defendants seek a stay with an indefinite delay. Indeed, Defendants merely state that they will "soon" be filing a motion under 28 U.S.C. § 1407 and that such a motion is "forthcoming." Stay Motion at 2. But no matter how "soon" such a motion is filed, it might take months to be heard. The MDL Panel will be unable to hear the case at its upcoming hearing session on July 30, 2015. *See Hearing Information*, United States Judicial Panel on Multidistrict Litigation, http://www.jpml.uscourts. gov/hearing-information. The next scheduled hearing is on October 1, 2015, and the following one is on December 3, 2015. *Id.* It is simply "unknown when the multilitigation panel will [or will decline to] issue a conditional transfer order to the MDL court," *Greene*, 344 F. Supp. 2d at 679, especially because Defendants have yet to even file the motion. But even if filed tomorrow, substantial delays are commonplace. *See, e.g.*, *Anderson v. Michaels Stores, Inc.*, No. 14-cv-500, 2014 WL 1613952, at *1 (E.D. Cal. Apr. 22, 2014) ("On February 20, 2014, plaintiff filed a motion for transfer for coordinated pretrial proceedings under 28 U.S.C. § 1407(c)(ii). That motion is still pending before the [MDL Panel]. Counsel for plaintiff expects that the motion will be heard on the MDL Panel's next hearing session on May 29, 2014."); *Glazer v. Whirlpool Corp.*, No. 08-cv-1624, 2008 WL 4490117, at *1 (N.D. Ohio Oct. 1, 2008) ("[On September 28, 2008,] Defendant Whirlpool filed a motion to transfer the case before the [MDL Panel], pursuant to 28 U.S.C. § 1407…. The MDL Panel will consider the motion at its next hearing session, scheduled for November.").

Accordingly, Defendants' motion for a stay is tantamount to a request that this Court preclude the Plaintiffs from promptly seeking preliminary injunctive relief before the Rule takes effect. This Court should not allow Defendants to run out the clock on Plaintiffs' preliminary injunction motion in this fashion.

**III.     Defendants Will Suffer No Hardship or Prejudice If the Stay Is Denied.**

Because it is "an extraordinary measure," *United States v. Breyer*, 41 F.3d 884, 893 (3d Cir. 1994), the party seeking a stay must demonstrate a "clear case of hardship or inequity, if there is even a fair possibility that that stay would work damage on another party," *Grider v. Keystone Health Plan Central, Inc.*, No. 2001-cv-05641, 2004 WL 1047840, at *1 n.1 (E.D. Pa. May 5, 2004) (citation omitted); *see also Jozwiak*, 2010 WL 147143, at *2.

Defendants hyperbolically assert that they will suffer "extreme prejudice" if "forced to simultaneously litigate multiple suits in multiple courts." Stay Motion at 8. But as Defendants concede, these cases "arise from the same agency rulemaking, involve the same administrative record for judicial review, and raise many of the same—if not identical—claims under the Administrative Procedure Act, the Clean Water Act, and the United States Constitution." *Id*. at 6. It is difficult to conceive how Defendants (*i.e.*, the federal government) will be burdened by having to litigate these legal arguments in eight district courts, other than the burden of repurposing their briefing to fit the specifics of the case. Indeed, Defendants' stay motion here is almost identical to their stay motion in the other cases. *See, e.g.*, *Georgia v. McCarthy*, No. 15-79 (Doc. 34-1) (July 21, 2015).

Defendants' chief reason for wanting a stay appears to be to "avoid the possibility of inconsistent rulings." Stay Motion at 6. But transfer and consolidation is not warranted "[m]erely to avoid [different] federal courts having to decide the same issue." *In re Medi-Cal*, 652 F. Supp. 2d at 1378; *see also In re Multijurisdiction Practice Litig.*, 52 F. Supp. 3d at 1378 ("Although plaintiffs seek efficiencies through centralized treatment of the disputed legal questions, [m]erely to avoid [different] federal courts having to decide the same issue is, by itself, usually not sufficient to justify Section 1407 centralization."); *In re Real Estate Transfer Tax Litig.*, 895 F. Supp. 2d at 1351 (same). Although one of the MDL Court's "prime

considerations is often the need to avoid inconsistent ruling on similar issues," "[u]sually, that consideration is bolstered by the concern for duplicative and burdensome discovery leading up to the legal issues." *In re Medi-Cal*, 652 F. Supp. 2d at 1378. Those concerns are not present here, where "very little discovery appears necessary prior to the joinder of the legal issues." *Id*.

## CONCLUSION

For the foregoing reasons, Defendants' Stay Motion should be denied.

Dated: July 24, 2015

Respectfully submitted,

By: /s/ Mary E. Kindelt
_____

Steven P. Lehotsky
Warren Postman
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H Street, NW
Washington, DC 20062
Tel: (202) 463-5337
Email: slehotsky@uschamber.com
Email: wpostman@uschamber.com

*Counsel for Plaintiff Chamber of Commerce of the United States of America*

Karen R. Harned
Luke A. Wake
NFIB SMALL BUSINESS LEGAL CENTER
1201 F Street, NW, Suite 200
Washington, DC 20004
Tel: (202) 314-2048
Email: karen.harNed@nfib.org
Email: luke.wake@nfib.org

Andrew D. Herman
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005
Tel: (202) 626-5869

James P. McCann, OBA No. 5865
John J. Carwile, OBA No. 10757
Mary E. Kindelt, OBA No. 21728
MCDONALD, MCCANN, METCALF & CARWILE, LLP
15 E. Fifth Street, Suite 1400
Tulsa, OK 74103
Tel: (918) 430-3700
Email: jmccann@mmmsk.com
Email: jcarwile@mmmsk.com
Email: mkindelt@mmmsk.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, VA 22201
Tel: (703) 243-9423
Email: will@consovoymccarthy.com
Email: tom@consovoymccarthy.com
Email: mike@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
3 Columbus Circle, 15th Floor
New York, NY 10019

Email: aherman@milchev.com

*Counsel for Plaintiff National
Federation of Independent Business*

Tel: (212) 247-8006
Email: park@consovoymccarthy.com

*Counsel for Plaintiffs Chamber of
Commerce of the United States of
America, National Federation of
Independent Business, State Chamber
of Oklahoma, Tulsa Regional
Chamber, and Portland Cement
Association*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 24, 2015, I electronically served the foregoing pleading with the Clerk of Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants that was sent to the following CM/ECF registrants:

Cathryn McClanahan

*/s/ Mary E. Kindelt*
_____

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERNDISTRICT OF OKLAHOMA**

(1) CHAMBER OF COMMERCE OF
    THE UNITED STATES OF AMERICA,

(2) NATIONAL FEDERATION OF
    INDEPENDENT BUSINESS,

(3) STATE CHAMBER OF OKLAHOMA,

(4) TULSA REGIONAL CHAMBER, and

(5) PORTLAND CEMENT ASSOCIATION,

        Plaintiffs,

    v.

(1) UNITED STATES ENVIRONMENTAL
    PROTECTION AGENCY,

(2) GINA MCCARTHY, in her official
    capacity as Administrator of the United
    States Environmental Protection Agency,

(3) UNITED STATES ARMY CORPS OF
    ENGINEERS, and

(4) JO-ELLEN DARCY, in her official
    capacity as Assistant Secretary of the
    Army (Civil Works),

        Defendants.

No. 4:15-cv-386-CVE-PJC
(Related: No. 4:15-cv-381-CVE-FHM)

## DECLARATION OF MICHAEL JACOBS

1.      My name is Michael Jacobs and I am a long-time resident of Delaware County, Oklahoma.

2.      I am the President of Jacobs Manufacturing Corporation in Delaware County, Oklahoma. My company makes fiberglass products for water and wastewater treatment.

3.      I am an active member of the National Federation of Independent Business.

4.      My family and I live on a 20-acre plot of land in Delaware County, Oklahoma. This land contains my home as well as about eight acres of hay, which we harvest throughout the year.

5.      Adjacent to this plot is a 50-acre plot of land, which I also own. Because this land is undeveloped, it has great potential to be used for economic activity and personal enjoyment.

6.      Before the Environmental Protection Agency recently enacted its rule regarding "navigable waters" under the Clean Water Act ("WOTUS Rule"), I had planned to develop this 50-acre property for agricultural and other purposes.

7.      Specifically, I planned to clear the area for cattle grazing and other farming purposes. This process would yield valuable timber, which I would sell for profit. I also planned to improve the land so that cattle could graze on the property, including putting fences up for the cattle, planting grass, removing excess trees, and impounding waters that flow from small underground springs.

8.      I had anticipated beginning this work in September or October of this year. After my property was cleared, I intended to raise about 30 cattle on the property. I planned to take these cattle to market in the summer or fall of 2016 and, hopefully, realize a sizable return on my investment.

9.      These improvements, I believe, would greatly increase the value of the property. After the improvements are finished, I hope to either sell the property or give it to one of my children so that they can build a home on the property.

10.      Because of the WOTUS Rule, however, I no longer believe it is economically feasible for me to make these improvements.

11.     A ravine runs across the entire portion of my 50-acre property. The ravine is about 75-85 feet deep and 200-250 feet wide.

12.     At the bottom of the ravine is a creek bed. The water at the bottom of the creek bed varies depending on the time of the year and the amount of rainfall.

13.     For about seven to eight months of the year, there is a very small stream of water running through the creek bed. This stream is about 2-3 feet wide and 5-6 inches deep.

14.     During the summer, the creek bed will often go dry and no water will run through it. Only a few small puddles of water will remain at the bottom of the ravine.

15.     At other times (usually when there has been heavy rainfall), the water in the ravine will rise and the stream will grow. At its peak, the stream is about 6-8 feet deep and 20-30 feet wide.

16.     When flowing, the water in the ravine feeds into the Spavinaw Creek, which flows into Lake Eucha and Lake Spavinaw. These waters eventually feed into the Arkansas River and the Mississippi River.

17.     My property also contains small natural springs, many of which are in the ravine. They are often about 25-30 feet above the creek bed on the shelves of the ravine. These springs are formed when water comes up from the ground and collects in pools. When active, they trickle across the property and into the creek bed below.

18.     My property also contains indentations in the ground where there are visible signs that water occasionally flows during storms.

19.     Before the WOTUS Rule, my property was not subject to federal regulation under the Clean Water Act. I thus was free to use my land for the agricultural and enjoyment purposes for which I had planned.

3

20.     After the WOTUS Rule becomes final, however, I believe these portions of my land will become subject to federal regulation under the Clean Water Act. I fear the federal government will classify these waters as "tributaries" because the land contains physical signs of occasional water flow and the water (when running through my property) eventually feeds into navigable waters downstream.

21.     Since I currently do not use this property for agricultural purposes, I do not believe it qualifies for any agricultural exemption.

22.     If my property is subject to the WOTUS Rule, I will be forced to halt all plans for improving my property because the rule would require me to obtain a costly permit from the federal government. For example, to raise cattle I will need to impound water on my property from the small natural springs on my property. This impoundment would now require a federal permit.

23.     Complying with these regulations is an enormous burden and expense. Given the huge undertaking I was already facing (clearing the land, financing the improvement, etc.), it would no longer be worthwhile to bear the additional costs and burdens imposed by the WOTUS Rule.

24.     The WOTUS Rule thus harms me in several ways. I will not be able to obtain the highest economic value from my property, as the property will remain unimproved and unused. And without such improvements, the land is less attractive to others. One goal of mine was to improve the land so that one of my children could build a home on the property. The WOTUS Rule makes that impossible.

25.     This land has already been greatly devalued—both because I cannot improve it and because potential buyers know that they must obtain a costly permit if they wanted to do so.

26.     In addition, the profits that I hoped to realize in the summer or fall of 2016 from cattle sales will be forever lost. Due to the WOTUS Rule, I will have to forego this investment opportunity and will be unable to use the land for these and other business purposes.

27.     The WOTUS Rule will stifle the valuable and productive use of my property. This Court should enjoin the implementation of the rule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2015

Michael Jacobs

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| (1) CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | |
| (2) NATIONAL FEDERATION OF INDEPENDENT BUSINESS, | |
| (3) STATE CHAMBER OF OKLAHOMA, | |
| (4) TULSA REGIONAL CHAMBER, and | |
| (5) PORTLAND CEMENT ASSOCIATION, | |
| Plaintiffs, | No. 4:15-cv-386-CVE-PJC |
| v. | (Related: No. 4:15-cv-381-CVE-FHM) |
| (1) UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, | |
| (2) GINA MCCARTHY, in her official capacity as Administrator of the United States Environmental Protection Agency, | |
| (3) UNITED STATES ARMY CORPS OF ENGINEERS, and | |
| (4) JO-ELLEN DARCY, in her official capacity as Assistant Secretary of the Army (Civil Works), | |
| Defendants. | |

## DECLARATION OF LEO STEVENS

1.      My name is Leo Stevens and I am a life-long resident of Rogers County, Oklahoma.

2.      I am currently a part owner of the Tri-State Electric Supply Company in Bartlesville, Oklahoma. Before that, I served my country as a member of the United States Air

Force. I have two children and three grandchildren. I graduated from Kansas State University with a degree in Biology.

3.      I am an active member of the National Federation of Independent Business.

4.      My wife and I own a home in Rogers County, Oklahoma. We have lived here since 1984.

5.      A small creek runs through the back of our property. This creek is dry about a third of the year, usually from August through November.

6.      When active, the creek is about four feet deep. The water from this creek flows into Bird Creek, which then flows into Verdigris River, which eventually flows into the Arkansas River.

7.      Before the Environmental Protection Agency recently enacted its rule regarding "navigable waters" under the Clean Water Act ("WOTUS Rule"), our land was not subject to federal regulation and so I was free to develop our property without federal interference.

8.      After the WOTUS Rule becomes final, however, I believe this part of our land will become subject to federal regulation under the Clean Water Act. I fear the federal government will classify this creek as a "tributary" because the land contains physical signs of occasional water flow and the water (when running through our property) eventually feeds into navigable waters downstream.

9.      This classification will immediately devalue our property. Much of our land's value comes from its potential. For example, one day I would like to build a home on it for one of my children or grandchildren. Others might use it for farming or for recreation.

10.     But these potential uses are greatly curtailed when the owner has to ask permission from the federal government to do routine activities, such as drilling a posthole,

filling a gully, or maintaining a septic system. Obtaining a federal permit is an enormous burden and expense. There is no question that the WOTUS Rule will decrease the value of our property.

11.     From my experience owning farmland, I can attest that this County's lands are already heavily regulated by the State and by the local government. As a result, I would face severe liability if I were to misuse my lands.

12.     The fact that our land is regulated by the State and by the local government is not surprising. What is surprising is that the *federal* government now claims authority to regulate my property because a small amount of water sometimes flows through a creek on my property.

13.     When we purchased this land, I never could have imagined that I would be subject to federal regulation for making basic improvements to the property.

14.     Like many Americans, my wife and I have invested our time, money, and labor into our land. We have never polluted a navigable or non-navigable water—either on our property or elsewhere. We are stewards of the land and we protect it. This real estate is the culmination of our life's work and represents a substantial part of our savings. This Court should stop this rule from taking effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July /7, 2015

_____
Leo Stevens